

# COURT OF APPEALS
### SECOND DISTRICT OF TEXAS
### FORT WORTH

### NO. 02-11-00333-CV

IN THE INTEREST C.L.D. AND
C.R.D., CHILDREN

----------

FROM THE 323RD DISTRICT COURT OF TARRANT COUNTY

----------

## MEMORANDUM OPINION[1]

----------

## I. Introduction

Appellant A.B. (Mother) appeals the trial court's judgment terminating her

parental rights to her two children, C.L.D. and C.R.D.[2] After a bench trial, the trial

court found that Mother had engaged in conduct or knowingly placed the children

---

[1]*See* Tex. R. App. P. 47.4.

[2]The trial court also terminated the parental rights of C.D. (Father), but
Father has not appealed the judgment.

with persons who had engaged in conduct that endangered the physical or emotional well-being of the children and had knowingly placed or knowingly allowed the children to remain in conditions or surroundings that endangered their physical or emotional well-being.[3] The trial court also found that termination of Mother's parental rights would be in the children's best interest. In her sole issue, Mother argues that the evidence is legally and factually insufficient to support the trial court's best interest finding. Mother does not challenge the trial court's statutory endangerment findings. We affirm.

## II. Background

Mother had a Department of Family and Protective Services (the Department) referral in January 2007 concerning her oldest child.[4] Mother was "extremely intoxicated" and began fighting with her mother, who called the police. When police arrived, Mother's hands were bleeding, and the police report stated that Mother had shaken her child and broken several windows in the home. The Department learned in January 2007 that Mother had been diagnosed with major depression and bipolar disorder; Mother was not taking her medication, and she "admitted to drinking to intoxication." In March 2007, Mother was arrested for striking her boyfriend's child while intoxicated. Mother was later convicted for injury to a child.

---

[3]*See* Tex. Fam. Code Ann. § 161.001(1)(D), (E) (West Supp. 2012).

[4]Mother's parental rights to her oldest child are not at issue in this appeal; she voluntarily relinquished her parental rights to that child in 2008.

In April 2007, the Department received a referral that Mother had her oldest child with her and was about to walk onto Interstate 30 in Arlington to kill herself. Mother told the investigator that she was not holding her child while walking on I-30, but the Department believed otherwise because Mother's boyfriend had arrived and was able to get their child off the highway and away from Mother. Mother remained on the highway until police arrived.

Mother attempted suicide in June 2007 while in jail. She was in and out of jail throughout 2007 and 2008, and she received Mental Health/Mental Retardation (MHMR) services while in jail. After leaving jail in March 2008, Mother voluntarily relinquished her parental rights to her oldest child.

In December 2008, Mother gave birth to C.L.D. The Department was concerned about Mother's drinking and her mental health stability, and Mother began working with an MHMR doctor soon thereafter. However, the Department received a new referral in March 2009 concerning Mother's drinking.

The Department offered services to Mother and provided transportation for her to work the services. Mother submitted to a drug and alcohol assessment and admitted that she had a drinking problem, and she made "quite a bit of progress" on her service plan during April and May 2009. She began attending a rehabilitation program and taking her depression medication.

Mother relapsed in June 2009. She agreed in July 2009 to attend a ninety-day, inpatient drug and alcohol program and to bring C.L.D. with her to the program, but Mother stayed for only about thirty days. Even so, Mother had

worked several parts of her service plan, had located an apartment, and was showing signs of improvement by early-Fall 2009. By November 2009, Mother seemed to be staying away from drugs and alcohol, and the pending case was closed in December 2009.

In June 2010, Mother drank alcohol while eight months pregnant with C.R.D. Mother told an investigator that she would drink alcohol because of arguments with Father and because "she just wanted to have a good time." In October 2010, police were called to Mother and Father's apartment because they had gotten into a fight. When interviewed later about the October 2010 incident, Mother said that neither child was in the apartment, that she was upset with Father for selling drugs, and that Father punched her in the side of her head. Mother also said that she pulled a knife to defend herself from Father.

The apartment complex management decided to evict Mother from her apartment the day after her altercation with Father, and apartment manager Edna Garcia went to Mother's apartment with another manager to serve her with an eviction notice. Garcia testified that she and the other manager could hear a baby screaming inside the apartment. They knocked numerous times "really, really hard," but no one answered. They retrieved a key to Mother's apartment, entered the apartment, and saw Mother asleep on a mattress on the floor. There was an infant, C.R.D., next to her screaming. C.L.D., who appeared to Garcia to be fifteen to seventeen months old, was also in the apartment eating infant formula out of a can, with crusted milk all in his mouth and his hands. Garcia

4

testified that she had a very difficult time waking Mother and that Mother appeared to be "high on drugs" when she finally awoke. The Department removed the children the same day.

Department caseworker Abigail Flores developed a service plan for Mother in November 2010 that required Mother to submit to drug and psychological assessments and to attend individual counseling and domestic violence counseling. The service plan also required that Mother address her mental health issues with services provided by MHMR because Mother had reported to Flores that she heard voices. Through MHMR, Mother would have access to psychiatrists, medication management, and social workers. Flores testified that Mother only made one phone call to MHMR two months before trial and did not otherwise engage with MHMR.

Flores testified that she provided Mother with bus passes to help her attend her appointments. Mother submitted to a psychological assessment but did not submit to a drug assessment. Mother passed each of her drug tests during the case and completed parenting classes, but she attended only one of twelve domestic violence counseling sessions. Mother was also discharged several times from individual counseling for nonattendance,[5] and she failed to maintain stable housing during the pendency of the case.

---

[5]The Department referred Mother to Positive Influences for individual counseling. Mother was discharged after missing the first three appointments. The Department made three additional attempts to have Mother attend

Flores testified that Mother's interaction with the children is appropriate, that she brings them things during visitations, and that she is bonded to the children. However, Mother missed the last few visitations before trial. Flores testified that Mother had not shown that she could take advantage of the services available to her, and she estimated that Mother completed twenty-five to thirty percent of her service plan. Flores also testified that termination of Mother's parental rights is in the children's best interest.

Mother's father testified that he will support Mother and that she has not been drinking the past three or four months. He testified that he will take her to appointments, but he agreed that he cannot force Mother to work her services. He also agreed that Mother needs help through MHMR and that she is not an appropriate parent when she is drinking, but he also testified that termination of Mother's parental rights is not in the children's best interest.

The children are together in foster care, and they have been in their current foster home for approximately five months. Flores said that the children are bonded to each other and that C.L.D. will console C.R.D. when C.R.D. is upset or needs something. Neither child has any developmental needs that require special therapeutic intervention, but Early Childhood Intervention specialists recently advised Flores that they intended to begin speech therapy with C.L.D.

counseling through Positive Influences, but Mother was discharged each time for nonattendance.

6

Flores testified that the children are doing really well in the foster home and that the current foster parents intend to adopt the children if Mother's parental rights are terminated. C.L.D. has become more open and verbal; he was "really reserved and really quiet" when he was initially placed in foster care, and he is "kind of coming out of that." C.R.D. "is attached. He's closer to the foster mom. When she's not inside, they look for her." Flores testified that C.R.D. often sits in the foster mother's lap or very near her. Flores also positively described the children's interactions with the foster father. Flores listed the subsidies and services that will be available to the foster parents if they adopt the children.

### III. Standards of Review

A parent's rights to "the companionship, care, custody, and management" of his or her children are constitutional interests "far more precious than any property right." *Santosky v. Kramer*, 455 U.S. 745, 758–59, 102 S. Ct. 1388, 1397 (1982); *In re M.S.*, 115 S.W.3d 534, 547 (Tex. 2003). "While parental rights are of constitutional magnitude, they are not absolute. Just as it is imperative for courts to recognize the constitutional underpinnings of the parent-child relationship, it is also essential that emotional and physical interests of the child not be sacrificed merely to preserve that right." *In re C.H.*, 89 S.W.3d 17, 26 (Tex. 2002). In a termination case, the State seeks not just to limit parental rights but to erase them permanently—to divest the parent and child of all legal rights, privileges, duties, and powers normally existing between them, except for the

child's right to inherit. Tex. Fam. Code Ann. § 161.206(b) (West 2008); *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985). We strictly scrutinize termination proceedings and strictly construe involuntary termination statutes in favor of the parent. *Holick*, 685 S.W.2d at 20–21; *In re R.R.,* 294 S.W.3d 213, 233 (Tex. App.—Fort Worth 2009, no pet.).

In proceedings to terminate the parent-child relationship brought under section 161.001 of the family code, the petitioner must establish one ground listed under subsection (1) of the statute and must also prove that termination is in the best interest of the child. Tex. Fam. Code Ann. § 161.001; *In re J.L.*, 163 S.W.3d 79, 84 (Tex. 2005). Both elements must be established; termination may not be based solely on the best interest of the child as determined by the trier of fact. *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987); *In re D.T.*, 34 S.W.3d 625, 629 (Tex. App.—Fort Worth 2000, pet. denied) (op. on reh'g). In this case, Mother does not challenge the trial court's section 161.001(1)(D) and (E) findings. Thus, we only address the sufficiency of the evidence concerning the trial court's best interest finding.

Termination decisions must be supported by clear and convincing evidence. Tex. Fam. Code Ann. § 161.001; *see also id.* § 161.206(a). Evidence is clear and convincing if it "will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." *Id.* § 101.007 (West 2008). Due process demands this heightened standard because termination results in permanent, irrevocable changes for the parent

8

and child. *In re J.F.C.*, 96 S.W.3d 256, 263 (Tex. 2002); *see In re J.A.J.*, 243 S.W.3d 611, 616 (Tex. 2007) (contrasting standards for termination and modification).

In evaluating the evidence for legal sufficiency in parental termination cases, we determine whether the evidence is such that a factfinder could reasonably form a firm belief or conviction that the grounds for termination were proven. *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005). We review all the evidence in the light most favorable to the finding and judgment. *Id.* We resolve any disputed facts in favor of the finding if a reasonable factfinder could have done so. *Id.* We disregard all evidence that a reasonable factfinder could have disbelieved. *Id.* We consider undisputed evidence even if it is contrary to the finding. *Id.* That is, we consider evidence favorable to termination if a reasonable factfinder could, and we disregard contrary evidence unless a reasonable factfinder could not. *Id.*

We cannot weigh witness credibility issues that depend on the appearance and demeanor of the witnesses, for that is the factfinder's province. *Id.* at 573, 574. And even when credibility issues appear in the appellate record, we defer to the factfinder's determinations as long as they are not unreasonable. *Id.* at 573.

In reviewing the evidence for factual sufficiency, we give due deference to the factfinder's findings and do not supplant the judgment with our own. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006). We determine whether, on the entire

record, a factfinder could reasonably form a firm conviction or belief that the termination of the parent-child relationship would be in the best interest of the child. Tex. Fam. Code Ann. § 161.001; *C.H.*, 89 S.W.3d at 28. If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction in the truth of its finding, then the evidence is factually insufficient. *H.R.M.*, 209 S.W.3d at 108.

### IV. Best Interest

Mother argues in her sole issue that the evidence is legally and factually insufficient to support the trial court's finding that termination of her parental rights is in the children's best interest.

### A. Applicable Law

There is a strong presumption that keeping a child with a parent is in the child's best interest. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006). Prompt and permanent placement of the child in a safe environment is also presumed to be in the child's best interest. Tex. Fam. Code Ann. § 263.307(a) (West 2008). Nonexclusive factors that the trier of fact in a termination case may use in determining the best interest of the child include:

(A)    the desires of the child;

(B)    the emotional and physical needs of the child now and in the future;

(C)    the emotional and physical danger to the child now and in the future;

10

(D)   the parental abilities of the individuals seeking custody;

(E)   the programs available to assist these individuals to promote the best interest of the child;

(F)   the plans for the child by these individuals or by the agency seeking custody;

(G)   the stability of the home or proposed placement;

(H)   the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one; and

(I)   any excuse for the acts or omissions of the parent.

*Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976) (citations omitted).

These factors are not exhaustive; some listed factors may be inapplicable to some cases; other factors not on the list may also be considered when appropriate. *C.H.*, 89 S.W.3d at 27. Furthermore, undisputed evidence of just one factor may be sufficient in a particular case to support a finding that termination is in the best interest of the child. *Id.* On the other hand, the presence of scant evidence relevant to each factor will not support such a finding. *Id.*

## B. Discussion

At the time of trial in August 2011, C.L.D. was two years old, and C.R.D. was one year old. The children are too young to have expressed their desires, but the evidence reflects that they have a bond with Mother. Even so, the children are doing well in foster care. C.L.D. was scheduled to begin speech therapy, but the children do not otherwise have developmental needs that require special therapeutic intervention. The children have bonded with their foster

11

parents, particularly their foster mother, and C.L.D. has changed away from the reserved and quiet manner he exhibited upon placement in foster care. The Department's plan for the children is adoption by their current foster family, and the trial court heard testimony about the propriety of the foster family and the programs and services that will be available to the foster family after adoption.

In contrast, Mother has a history of mental health problems and instability, including incidents of violence with her oldest child, her mother, and Father; striking her boyfriend's child; attempting suicide; and drinking alcohol to extreme intoxication. The Department attempted to work with Mother beginning in 2007, and although Mother made progress during certain intervals, she had completed less than half of the services offered to her during the year before the termination trial. Although Mother had completed parenting classes, Flores testified that Mother had not demonstrated an ability to take advantage of the services available to her.

Applying the appropriate standards of review, we hold that the evidence is legally and factually sufficient to support the trial court's finding that termination of Mother's parental rights is in the children's best interest. *See H.R.M.*, 209 S.W.3d at 108 (discussing factual sufficiency standard of review); *J.P.B.*, 180 S.W.3d at 573 (discussing legal sufficiency standard of review). We therefore overrule Mother's sole issue.

## V. Conclusion

Having overruled Mother's sole issue, we affirm the trial court's judgment.

ANNE GARDNER
JUSTICE

PANEL:  LIVINGSTON, C.J.; DAUPHINOT and GARDNER, JJ.

DELIVERED:  July 26, 2012